UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JESUS CARO LOPEZ *et al.*,

          Defendant.

Case No. 1:17-cr-269

OPINION & ORDER
[Resolving Docs. 126, 132, 133]

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

With others, Defendants Jesus Caro Lopez and Miguel Estrada were indicted in July 2017 on charges related to an alleged drug conspiracy.[1]  Lopez moves to suppress evidence collected by the government through Title III wiretaps and Estrada moves to join Lopez's motion to suppress.[2] They also request a *Franks* hearing and an oral hearing related to that motion.[3]  Estrada also moves to dismiss the charges against him, arguing that the Northern District of Ohio is an improper venue for trial of those charges.[4]

For the reasons below, the Court **DENIES** the motion to suppress, motion to join, and motion to dismiss.

## I. BACKGROUND

Defendants move to suppress evidence collected through Title III wiretaps.  An affidavit prepared by a Special Agent who participated in and received reports from other law enforcement officers involved in the investigation of this drug conspiracy supported the wiretaps.[5]  Because

---

[1] Doc. 1.
[2] Docs. 132, 133.
[3] *Id.*
[4] Doc. 126.
[5] Affidavit in Support of Title III Application (hereinafter "Affidavit") at ¶ 5.  For the purpose of this opinion, the Court recounts the facts of the initial investigation as recounted in the Affidavit and the indictment.  The Court expresses no opinion as to what the evidence at trial might show.

Defendants challenge the sufficiency of that affidavit to support the Title III, the Court uses the history given with that affidavit. Because Defendants challenge the sufficiency of the affidavit, the Court necessarily considers whether the information contained within the four corners of the affidavit established probable cause for the Title III intercepts.

## A. The Initial Conversations

According to the affidavit, in 2016, a confidential source, whom the Court will refer to as John Doe, began supplying information to law enforcement about Rogelio Cervantes.[6] Informant Doe knew Cervantes between 2008 and 2010. The Informant and Cervantes were "casual friends."[7] Around 2010, Cervantes began to discuss drug trafficking and Mexican drug cartels with the Informant Doe.[8]

As described in the affidavit, on May 4, 2016, Informant Doe met with Cervantes at Cervantes's Westlake, Ohio, Mexican restaurant.[9] According to the affidavit used to obtain Title III authority, Doe asked Cervantes if Cervantes could supply him with kilogram amounts of cocaine.[10] In response, Cervantes agreed to introduce the Informant to his Mexico-based drug supplier.[11] Officers later identified Defendant Lopez as the supplier.[12] The affidavit says that Cervantes promised he would contact Doe after Cervantes spoke to Lopez about supplying Doe with cocaine.[13]

The affidavit says Doe and Cervantes met again on August 11, 2016, at a North Ridgeville,

---

[6] *Id.* at ¶ 14.
[7] *Id.*
[8] *Id.*
[9] *Id.* at ¶ 15.
[10] *Id.*
[11] *Id.*
[12] *Id.*; Doc. 136 at 2; *see generally* Doc. 1. The Affidavit refers to Lopez as "Cousin" because the supplier had not yet been identified at the time the Affidavit was filed. *Id.* For consistency and clarity, this opinion will refer to him as Lopez.
[13] Affidavit at ¶ 15.

Ohio, restaurant Cervantes owned.[14] According to the affidavit, Cervantes and Doe "discussed the future potential and logistics of having" Lopez "transport kilogram amounts of cocaine to the Cleveland, Ohio[,] area for distribution."[15] Cervantes explained that Lopez is the nephew of Raphael Caro Quintero, a Mexican drug lord currently wanted for the 1985 murder of a DEA agent.[16] According to Cervantes, Lopez formerly lived in the United States and operated an Oregon drug trafficking organization.[17] American officials had earlier deported Lopez after he was caught transporting $600,000 to Mexico.[18]

Cervantes told Informant Doe that Lopez wanted to establish a Cleveland drug distribution hub.[19] The affidavit described Cervantes as representing that Lopez could provide Informant Doe or other Ohio-based distributors with cocaine, heroin, and crystal methamphetamine ("crystal meth").[20] The Informant and Cervantes also discussed how to launder drug proceeds through various means, including restaurants and other business ventures.[21]

In this same conversation, the Informant told Cervantes that the Informant did not want to be *directly* involved in drug trafficking.[22] Instead, Informant Doe told Cervantes that he wanted to work through his associate. The Court refers to the Informant's associate as Agent Smith.[23] Agent Smith was an undercover agent.[24] Informant Doe told Cervantes that Agent Smith was "an established drug trafficker in the Cleveland area . . . capable of distributing kilogram amounts of illegal drugs in a short period of time."[25] Cervantes agreed to later meet with Doe and Agent Smith

---

[14] *Id.* at ¶ 17.
[15] *Id.*
[16] *Id.* at ¶ 17 & n.3.
[17] *Id.* at ¶ 18.
[18] *Id.*
[19] *Id.*
[20] *Id.* at ¶ 19.
[21] *Id.* at ¶ 21.
[22] *Id.* at ¶ 20.
[23] *Id.*
[24] *Id.*
[25] *Id.*

to discuss future business.[26]

The affidavit relates that shortly after that meeting, Doe received a phone call from a phone number ending in 3357 (hereinafter "the 3357 number"), which was registered to Cervantes.[27] Cervantes was the caller.[28] According to the affidavit, Cervantes informed Informant Doe that Lopez agreed to supply Cervantes with kilogram amounts of cocaine.[29] The affidavit shows that phone records revealed that, just prior to this call, the 3357 number had been used to call an international number ending in 0802, that belonged to Lopez.[30]

## B. The Planning Intensifies

According to the affidavit, on August 22, 2016, Doe and Cervantes met again at the North Ridgeville restaurant.[31] At the meeting, Doe told Cervantes that he and Agent Smith wanted to buy two kilograms of cocaine.[32] Cervantes responded that Lopez wanted to get back into the United States and said he would talk to Lopez and get back to Doe.[33] After this meeting, trap-and-trace records show that Cervantes's 3357 number again called Lopez.[34]

The affidavit says Doe and Cervantes met again two days later.[35] At that meeting, Cervantes described Lopez as wanting to return to the United States before Lopez before setting up the drug sale to Informant Doe or Agent Smith.[36] Cervantes said that once Lopez made it to California, Lopez would send drugs to Cleveland.[37] Cervantes told Doe that Cervantes and Lopez

---

[26] *Id.*
[27] *Id.* at ¶¶ 4, 21.
[28] *Id.* at ¶ 21.
[29] *Id.*
[30] *Id.* at ¶ 21 & 22 n.5
[31] *Id.* at ¶ 22.
[32] *Id.*
[33] *Id.*
[34] *Id.* at ¶ 22 n.5.
[35] *Id.* at ¶ 23.
[36] *See id.* at ¶¶ 23–25.
[37] *Id.* at ¶ 23.

would set up businesses to launder the proceeds.[38]  In the same conversation, Cervantes agreed to meet with Agent Smith to see if he felt comfortable introducing Agent Smith to Lopez.[39]

According to the affidavit the next day, Cervantes met with Doe and Agent Smith at Cervantes's North Ridgeville restaurant.[40]  Cervantes explained to Doe and Agent Smith how Lopez obtained drugs in Mexico and paid a cartel to get the drug shipments into the United States.[41] Cervantes said he was going to wire $15,000 to Lopez to help Lopez bribe a Border Patrol agent and re-enter the United States.[42]  With Lopez in the United States, Cervantes, Smith, Doe, and Lopez would meet to discuss setting up the distribution hub.[43]  According to the affidavit, Agent Smith told Cervantes that Smith could distribute kilogram amounts of narcotics and already had numerous mid-level drug traffickers lined up to purchase them.[44]

On September 15, 2016, Agent Smith left a voice message for Cervantes at the 3357 number, asking Cervantes to call him back.[45]  Cervantes returned his call from the 3357 number about an hour later.[46]  They arranged to meet at a Westlake restaurant later that day.[47]

According to the affidavit, at the September 15, 2016, meeting, Cervantes explained to Agent Smith that Lopez needed $15,000 for bribe money to reenter the United States.[48]  Cervantes proposed to Smith that Cervantes would pay $7,500 of the smuggling cost and Agent Smith would provide the other $7,500.[49]  Agent Smith agreed.[50]

---

[38] *Id.*
[39] *Id* at ¶ 25.
[40] *Id.* at ¶ 26.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.* at ¶ 28.
[45] *Id.* at ¶ 29.
[46] *Id.* at ¶ 31.
[47] *See id.* at ¶¶ 31–32.
[48] *Id.* at ¶ 33.
[49] *Id.*
[50] *Id.*

The affidavit described a scheme, proposed by Cervantes, where Cervantes would connect Agent Smith with Lopez so they could conduct business together.[51] The affidavit describes Cervantes as saying he "want[ed] to be the laundry guy," and that he was worth $5,000,000.[52] Cervantes shared ideas about laundering drug proceeds into high-cash-flow, Mexican-style fast food restaurants.[53]

After this meeting, the affidavit describes Agent Smith's participation in a speakerphone conversation with Lopez and Cervantes that Cervantes initiated from the 3357 number[54] The affidavit describes Lopez as saying he already had cocaine in Los Angeles, but Cervantes wanted to wait until Lopez was back in the country before any cocaine was transported to Cleveland.[55]

The affidavit describes Cervantes as instructing Agent Smith to deposit the $7,500 in a Chase bank account.[56] Agent Smith did so on September 16.[57] Afterwards, Agent Smith texted Cervantes at the 3357 number to confirm that the deposit had been made.[58] An acknowledging text message was sent from the 3357 number two minutes later. [59]

On September 21, 2016, Cervantes obtained another phone and gave Agent Smith the phone number ("the 8657 number").[60] That day, Cervantes (using the 8657 number) and Agent Smith exchanged text messages with Cervantes using both the 3357 number and the 8657 number.[61] That evening, Agent Smith called Cervantes at the 8657 number.[62] Cervantes explained that people working for Lopez's Mexican drug lord uncle were helping Lopez re-enter the

---

[51] *Id.* at ¶ 34.
[52] *Id.*
[53] *Id.*
[54] *Id.* at ¶ 35.
[55] *Id.*
[56] *Id.* at ¶ 36.
[57] *Id.* at ¶ 37.
[58] *Id.* at ¶ 38.
[59] *Id.* at ¶ 39.
[60] *Id.* at ¶ 42.
[61] *Id.* at ¶¶ 43–44.
[64] *Id.* at ¶ 48.

country.[63]

## C. The Plan Hits a Snag

According to the affidavit, Cervantes and Agent Smith spoke on the phone on the evening September 26, 2016.[64]  Cervantes explained that Lopez was having trouble getting in touch with his contact with the Border Patrol agent.[65]  Cervantes assured Agent Smith Cervantes had complained to Lopez about Lopez's delay in getting to Ohio.[66]  Cervantes and Agent Smith agreed to give Lopez a few more days to cross the border.[67]

According to the affidavit, Cervantes contacted Agent Smith on October 11, 2016, to schedule a meeting.[68]  On October 15, 2016, they met at a Bob Evans in Westlake.[69]  At that meeting, Cervantes told Agent Smith that Lopez had difficulty entering the United States but had promised to contact Cervantes when he reached Los Angeles.[70]  Lopez assured Cervantes that, if Lopez were arrested, he would still arrange for Cervantes to get all the drugs he wanted through Lopez's brother.[71]  Cervantes told Agent Smith that Lopez's brother worked for El Chapo, the head of the Sinaloa Cartel.[72]

Cervantes told Agent Smith that Cervantes was going to order two kilograms of cocaine and five pounds of crystal meth from Lopez.[73]  Cervantes discussed the price for the drugs, the cost of shipping them to Cleveland, and other logistical and financial considerations of the buy.[74]

The affidavit describes Cervantes' explanation of Lopez's continued problems getting to

---

[64] *Id.* at ¶ 48.
[64] *Id.* at ¶ 48.
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.* at ¶ 51.
[69] *Id.* at ¶¶ 51–57.
[70] *Id.* at ¶ 57.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*

Ohio.[75]  The affidavit says Cervantes said he had spoken to Lopez and arranged to have Lopez's

brother transmit drugs to Cleveland.[76]  Cervantes and Agent Smith agreed to order one kilogram

of cocaine and five pounds of crystal meth so that Agent Smith could assess the quality of the

product.[77]

**D. Cervantes Becomes Suspicious, But Eventually Proceeds**

The affidavit then describes a November 6, 2016, meeting that Agent Smith had with

Cervantes met at LA Fitness Gym in Brooklyn, Ohio.[78]  The affidavit describes Cervantes as

explaining that he believed he was being investigated by the FBI and had cancelled the drug

shipment for that reason.[79]  Cervantes wanted to wait for a period of time before arranging for

another shipment.[80]

According to the affidavit, on November 10, 2016, Cervantes contacted Agent Smith to

arrange another meeting.[81]  They met in the parking lot of a Westlake restaurant.[82]  Agent Smith

joined Cervantes in his car.[83]  Cervantes told Agent Smith that he had spoken to Lopez, telling

Lopez that: "I'm a little scared about this s[***].  Now I don't trust anybody.  We have no product.

We owe [Agent Smith] $7,500.  I would like to get product . . . for [Agent Smith]."[84]  According

to Cervantes, Lopez wanted to deal directly with Agent Smith.[85]  Lopez, however, was still in

Mexico.[86]

The affidavit says that Agent Smith responded that he was frustrated that Cervantes and

---

[75] *Id.* at ¶ 63.
[76] *Id.*
[77] *Id.*
[78] *Id.* at ¶¶ 63–68.
[79] *Id.*
[80] *Id.*
[81] *Id.* at ¶ 70.
[82] *Id.* at ¶¶ 70–72.
[83] *Id.* at ¶ 72.
[84] *Id.* at ¶ 73.
[85] *Id.*
[86] *Id.*

Lopez had not delivered on their promise to supply drugs.[87]  Cervantes replied that that was the reason he wanted to arrange for something to be sent to Smith: to prove that Lopez was "for real."[88]

The affidavit then says Cervantes called Lopez and placed the phone on speaker.[89]  Lopez said he could send five pounds of methamphetamine now and that he would follow up with kilograms of cocaine if the shipment went well.[90]  Lopez and Agent Smith agreed that the drugs would be sent by mail.[91]

Cervantes and Agent Smith then entered the restaurant.[92]  Cervantes said that he did not want to wait for Lopez to enter the United States before they started shipping drugs to Cleveland.[93]  The two agreed to proceed cautiously because Cervantes believed he might be under FBI investigation.[94]  Cervantes and Agent Smith also agreed to include cocaine in the next shipment if the methamphetamine shipment went well.[95]

Agent Smith then said that he wanted Cervantes to help launder the drug proceeds.[96]  Cervantes said "he would launder the drug proceeds through high-cash businesses like car washes or purchasing property."[97]  He said: "When you own businesses, you can play with it . . ., it not [sic] a red flag, it looks normal."[98]

Cervantes and Agent Smith then returned to Cervantes's car and placed another call to Lopez.[99]  Cervantes told Lopez that it would be nice to have both the methamphetamine and the

---

[87] *Id.* at ¶ 74.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.* at ¶ 75.
[93] *Id.* at ¶ 76.
[94] *Id.*
[95] *Id.*
[96] *Id.* at ¶ 77.
[97] *Id.*
[98] *Id.*
[99] *Id.* at ¶¶ 79–80.

cocaine at the same time.[100]  Cervantes said he wanted to put Agent Smith and Lopez into direct

contact so that he didn't have to be the go between all the time.[101]  Cervantes made arrangements

for the drugs to be delivered and then gave Agent Smith a phone number where he could reach

Lopez.[102]

Agent Smith called Lopez on November 11, 2016.[103] Lopez assured Agent Smith that the

drugs would arrive in the next few days, but as of November 21, 2016, the investigation had not

been successful in making a controlled buy.[104]

**E. The Wiretap Application**

On November 23, 2016, the government submitted a wiretap application for the 3357 and

8657 numbers under Title III.[105]  Accompanying that application was an affidavit prepared by a

Special Agent setting forth the factual allegations above.[106]  That affidavit also contained other

information relevant to Lopez's motion to suppress.

First, paragraph 13 described the reliability of the sources of the information contained in

the Affidavit.  It explained that Informant Doe was reliable because:

> Source 1 has positively identified photographs of ROGELIO CERVANTES.
> Source 1 has provided information to the FBI and NOLETF Officers since July,
> 2001.  Source 1's information has never been found to be false or misleading.
> Source 1's cooperation is for monetary gain.  Source 1 and an Undercover Agent
> (hereinafter referred to as UCA) have made consensually monitored and recorded
> conversations setting up the purchase and controlled delivery of cocaine from
> CERVANTES and COUSIN.  Source 1 has conducted consensually monitored and
> recorded conversations in support of this FBI investigation. From 2001 to 2010,
> Source 1 assisted the Westlake Police Department in four separate investigations
> which led to the successful prosecution of several subjects.  ***Source 1's information
> concerning ROGELIO CERVANTES and COUSIN has been corroborated by***

---

[100] *Id.* at ¶ 80.

[101] *See id.*

[102] *Id.*

[103] *Id.* at ¶ 81.

[104] *Id.* at ¶¶ 81–82.

[105] Doc. 139; Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title III, § 802 et seq., 82 Stat. 211, 211–25 (codified as amended at 18 U.S.C. § 2510 et seq.).

[106] Affidavit at ¶¶ 14–82.

*the UCA, through* physical surveillance, a review of various records· (such as BMV records, Lexis/Nexis, Choicepoint, OHLEG, and NCIC), consensually monitored conversations with CERVANTES, *controlled drug purchases*, records searches and telephone records analysis conducted by your Affiant, and other NOLETF officers. Source l's criminal history includes drug trafficking, drug possession, felonious assault, and domestic violence. For these reasons, your Affiant considers Source l's information concerning CERVANTES, COUSIN and other members of CERVANTES'S [Drug Trafficking Organization] to be reliable.[107]

Defendants argue that affidavit incorrectly supported the Informant's credibility by saying the Informant had engaged in controlled drug purchases from Cervantes before the application was submitted. [108]   Defendant Lopez, Defendant Estrada, and the government all agree that—notwithstanding the emphasized text above—at the time this affidavit was signed, no controlled buys had yet been made.[109]

The Affidavit also contains an extensive discussion of the reasons why normal investigative procedures would not be sufficient to obtain the information a wiretap might disclose. In nearly sixty paragraphs, the Affidavit discusses various possible surveillance and investigative techniques and why they are not adequate in this case.[110]  The Affidavit addresses why law enforcement was not able to obtain the information it needed through mail covers, financial investigations, confidential sources, undercover agents, controlled drug purchases, grants of immunity, interviews, grand jury investigations, surveillance, pen registers, tap and trace devices, pole cameras, mobile tracking devices, trash pulls, and search warrants.[111]

The Court granted the application for a wiretap on November 23, 2016.[112]

**F. Miguel Estrada's Involvement**

According to the indictment, Lopez and Cervantes and their interactions with Informant

---

[107] Affidavit at ¶ 13 (emphasis added).
[108] Doc. 132 at 14–16.
[109] *Id.*; Doc. 133; Doc. 136 at 9–11.
[110] *Id.* at ¶¶ 90–148.
[111] *Id.*
[112] Doc. 139 at 108–17.

Doe and Agent Smith were part of a much larger drug conspiracy masterminded primarily by Lopez. [113]   Part of this conspiracy involved distributing drugs in Portland, Oregon, and elsewhere. [114]   The indictment alleges that Defendant Estrada was a narcotics distributor in Portland.[115]

The indictment alleges that in January 2017, Lopez directed Ramiro Payan Lopez, another defendant in this case, to transport drugs to Oregon for Lopez.[116]  Estrada apparently booked a hotel room for Payan Lopez where Lopez met Payan Lopez and retrieved the drugs.[117]

The indictment also suggests that Estrada purchased or attempted to purchase drugs from Lopez.[118]

## G. Procedural History

In July 2017, the Government indicted Defendants Lopez and Estrada, as well as eleven other individuals, on drug charges. [119]   The indictment charges Lopez with (1) one count of conspiracy to possess with intent to distribute methamphetamine and cocaine; (2) two counts of distribution of methamphetamine; (3) one count of conspiracy to commit money laundering; and (4) one count of use of a communication facility in a felony related to controlled substances.[120] The Government charged Estrada with (1) conspiracy to possess with intent to distribute methamphetamine and cocaine and (2) use of a communication facility in a felony related to controlled substances.[121]

Defendant Lopez now moves to suppress any evidence against him collected by means of

---

[113] *See* Doc. 1 at 1–4.
[114] *Id.* at 4.
[115] *Id.*
[116] *Id.* at 23–24.
[117] *Id.* at 24.
[118] *See id.* at 25–26.
[119] *Id.* at 1–95.
[120] *Id.* at 1–88, 90, 92–94.
[121] *Id.* at 1–88, 94.

or resulting from the Title III wiretap of his communications.[122]  The government opposes.[123]

Defendant Estrada, for his part, moves to dismiss the charges against him, arguing that the Northern District of Ohio is an improper venue for them.[124]  He also moves to join Defendant Lopez's motion to suppress.[125]  The government opposes both motions.[126]

## II. MOTION TO SUPPRESS

### A. Legal Standard

Title III's § 2518(3) authorizes federal judges to authorize wiretaps where (1) "there is probable cause for belief that an individual is committing, has committed, or is about to commit" certain offenses; (2) "there is probable cause for belief that particular communications concerning that offense will be obtained through" the wiretap; (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;" and (4) there is probable cause for belief that the person targeted commonly uses the communications facilities to be intercepted in furtherance of the suspected criminal activity.[127]

The probable cause standard in § 2518(3) is consistent with the Fourth Amendment's probable cause standard applied for search warrants.[128]  Probable cause exists where the facts contained in the wiretap application support a practical, common sense determination that there is a "fair probability" or "substantial chance" that a person is engaged in criminal activity or evidence

---

[122] Doc. 132.

[123] Doc. 136.

[124] Doc. 126.

[125] Doc. 133.

[126] Docs. 136, 137.

[127] 18 U.S.C. § 2518(3).  Neither Defendant Lopez nor Defendant Estrada seek suppression under the Fourth Amendment, so the Court restricts its analysis to the application of Title III.  As Title III is, if anything, more stringent than the Fourth Amendment, however, the result would be the same if the defendants had sought suppression on constitutional grounds.

[128] *United States v. Asker*, 676 F. App'x. 447, 455 (6th Cir. 2017); *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988).

of criminal activity will be found in a given location.[129]  A court reviewing a magistrate's issuance of a Title III order gives great deference to the magistrate's probable cause determination, reversing it only if there was not a "substantial basis" for the finding of probable cause.[130]

A wiretap order is invalid if the application for that order establishes probable cause only by means of a false statement that was included intentionally or with reckless disregard for the truth.[131]  A defendant may be entitled to a so-called *Franks* hearing to prove that the information in the warrant application is false.  But to obtain a *Franks* hearing a defendant must make "a substantial preliminary showing" that both: (1) a false statement was knowingly and intentionally included in the warrant affidavit or was included with reckless disregard for the truth; and (2) that the false statement was "necessary to the finding of probable cause."[132]

Title III also requires the government to show that the wiretap was necessary.[133]  This requirement ensures that wiretaps are not "routinely employed as the initial step in criminal investigation[s]."[134]  "[T]he government need not prove the impossibility of other means of obtaining information."[135]  Instead, their application must (1) demonstrate that they gave "serious consideration to [using] non-wiretap techniques prior to applying for wiretap authority" and (2) inform the court "of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate."[136]  The point of Title III's necessity requirement "is not to

---

[129] *See Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13 (1983); *see also United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) ("The magistrate judge properly found probable cause.  Certainty is not required, but rather a fair probability and something more than mere suspicion.").

[130] *Alfano*, 838 F.2d at 162 (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)).  It is unclear how much this principle of deference applies where, as here, the same judge that issued the warrant is reviewing a challenge to the initial probable cause finding.  Nonetheless, deference or no deference, the Court would reach the same conclusion as to Defendant Lopez's motion to suppress and Defendant Estrada's motion to join.

[131] *See Poulsen*, 655 F.3d at 504–05; *cf. Franks v. Delaware*, 438 U.S. 154 (1978).

[132] *Poulsen*, 655 F.3d at 504 (6th Cir. 2011) (quoting *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008)).

[133] 18 U.S.C. § 2518(3)(c).

[134] *See United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

[135] *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002).

[136] *Id.* (quoting *Lambert*, 771 F.2d at 91).

foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques."[137]

**B. Defendant Estrada Lacks Standing to Challenge the Wiretaps**

The Court first considers Defendant Estrada's motion to join Defendant Lopez's motion to suppress the evidence collected from wiretaps of the 3357 and 8657 numbers. The government contends that Estrada lacks standing to do so.[138] The Court agrees.

Title III gives only "aggrieved persons" the right to seek suppression of evidence collected via wiretaps.[139] The statute defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." [140] Thus, a defendant who is not named in the wiretap order or a party to the conversations intercepted as a result of that order cannot seek suppression under Title III.[141]

Although Defendant Lopez's suppression motion seeks the suppression of all wiretap evidence collected in this case and any evidence derived therefrom, it challenges the legality of only the initial, November 2016, application for Title III authorization.[142] Defendant Estrada is not mentioned in that application, nor does he provide any other evidence suggesting that the government's investigation—at the time it sought the November 2016 authorization—was otherwise directed at him.[143] Moreover, Estrada was not a party to any of the conversations

---

[137] *Landmesser*, 553 F.2d at 20 (quoting *United States v. Pachecco*, 489 F.2d 554, 565 (5th Cir. 1974)).

[138] Doc. 136 at 6.

[139] 18 U.S.C. § 2518(10)(a).

[140] *Id.* § 2510(11).

[141] *United States v. Fury*, 554 F.2d 522, 526 (2d Cir. 1977); *see also United States v. Cooper*, 868 F.2d 1505, 1509–10 (6th Cir. 1989) ("With particular regard to electronic eavesdropping, [in order to show that he has standing] the accused must show that it was directed at *him*, that the government intercepted *his* conversations, or that the wiretapped communications occurred at least partly on *his* premises." (emphasis in original)).

[142] *See generally* Doc. 132.

[143] *See generally* Docs. 133, 139.

obtained under the first Title III authorization.[144]

It is true that evidence collected via the first Title III authorization led the government to seek additional Title III authorizations and that Estrada was a party to some of the conversations intercepted via the later authorizations.[145]  But that does not give him standing to challenge the legality of the first Title III order.  If someone's rights were violated by the first order, they were not Estrada's rights.[146]  "[A] defendant may not successfully challenge the admissibility of evidence on the basis that the evidence is tainted [by] (or 'the fruit of') some past infringement of another's rights."[147]

For those reasons, the Court **DENIES** Defendant Estrada's motion to join Defendant Lopez's motion to suppress.[148]

## C. Suppression is Not Warranted as to Defendant Lopez

Defendant Lopez argues that the November 2016 Title III order was invalid because (1) it was not supported by probable cause, (2) the affidavit supporting the order contained false or misleading statements, and (3) the affidavit supporting the order failed to show that the wiretap was necessary.[149]  The Court rejects all three contentions.

### 1. The November 2016 Title III Order was Supported by Probable Cause

Lopez first contends that there was no probable cause to approve the Title III order because, at the time the application was submitted, "[a]bsolutely no narcotics offenses had occurred and there were no details about any future narcotics offenses."[150]  But that argument is easily rejected.

---

[144] Doc. 136 at 6.
[145] *Id.*
[146] *Asker*, 676 F. App'x. at 455.
[147] *United States v. Williams*, 737 F.2d 594, 616 (7th Cir. 1984); *accord. United States v. Mercado*, 110 F. App'x. 19, 21 (9th Cir. 2004) (applying this principle to a Title III application); *United States v. Scasino*, 513 F.2d 47, 48–49 (5th Cir. 1975) (same).
[148] Even if Estrada did have standing to join the suppression motion, doing so would be fruitless because suppression is not warranted for the reasons discussed below.
[149] Doc. 132.
[150] *Id.* at 14–15.

Title III authorizes the issuance of a wiretap order both where there is probable cause to believe an offense *has* occurred and where there is probable cause to believe an enumerated offense "*is about to*" occur.[151]  Enumerated offenses include "any offense involving . . . the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States . . . ."[152]

As described above, the Affidavit supporting the wiretap request contains ample evidence that a criminal offense was about to occur.  The Affidavit describes an extensive series of conversations in which Cervantes and Lopez plotted to ship narcotics to Cleveland.  In furtherance of that plan, Lopez attempted at least twice to illegally enter the United States.[153]  Cervantes collected $7,500 to bribe a border patrol agent and his contact, and Cervantes pledged to contribute a further $7,500 of his own money to the effort.[154]  Cervantes made extensive plans with Agent Smith as to how the conspiracy would operate once Lopez arrived—including discussing how his properties and future business endeavors could be used to smuggle drugs and launder the proceeds.[155]  Moreover, the Affidavit reveals that one abortive attempt to ship drugs to Cleveland had only been abandoned because Cervantes came to (rightly) suspect he was under FBI investigation.[156]  And even then Cervantes indicated a desire to proceed with transporting and selling drugs after waiting a while.[157]  Finally, at the time the Affidavit was submitted, Cervantes and Lopez had just promised to send drugs to Agent Smith through the mail in the near future (though there had apparently been some delay).[158]

---

[151] 18 U.S.C. § 2518(3)(a) (emphasis added).
[152] *Id.* § 2516(1)(e).
[153] Affidavit at ¶¶ 48, 50, 63.
[154] *Id.* at ¶¶ 33, 36–40.
[155] *E.g., id.* at ¶¶ 23, 34, 57, 59, 61, 63, 77.
[156] *Id.* at ¶¶ 63–68.
[157] *Id.* at ¶ 68.
[158] *Id.* at ¶¶ 70–82.

It is impossible to suggest with a straight face that all of this is not enough to allow a reasonable magistrate to conclude that there is a fair probability or substantial chance that a drug offense was about to occur. And that is to say nothing of the probability that other enumerated offenses were about to occur, such as aiding an individual in illegally entering the United States[159] or bribing a public official.[160] Moreover the affidavit described frequent Cervantes telephone calls using the 3357 and 8657 numbers to organize drug purchases, including many conversations with Lopez. The affidavit therefore establishes probable cause to believe that (1) a wiretap would uncover evidence of those offenses and (2) Cervantes commonly used those numbers in furtherance of them.

### 2. No *Franks* Hearing is Warranted.

Defendant Lopez next contends that the November 2016 Title III order is invalid because the affidavit filed in support of the application for that order contained intentionally false or misleading statements.[161] That argument also fails.

Lopez points to one statement, buried in the middle of the explanation of Doe's credibility quoted above, to support his argument.[162] That statement reads: "[Doe]'s information concerning ROGELIO CERVANTES and [LOPEZ] has been corroborated by [Agent Smith] through . . . controlled drug purchases . . . ."[163] As Lopez correctly points out, that statement is false.[164] No

---

[159] 8 U.S.C. § 1327; 18 U.S.C. § 2516(1)(m).

[160] 18 U.S.C. §§ 201, 2516(1)(b).

[161] Doc. 132 at 15–16.

[162] Lopez vaguely mentions "other false statements in the Affidavit" on one page of his motion. *Id.* at 15. But it is Lopez's burden to point to specific statements in the Affidavit that he believes to be false or misleading. *Stewart*, 306 F.3d at 304. Because Lopez only points to one statement in the Affidavit with any specificity, the Court addresses only that statement and Lopez has forfeited the opportunity to argue that any other statement in the Affidavit is either false or misleading.

[163] Affidavit at ¶ 13.

[164] The government's attempts to suggest otherwise are unpersuasive. The Special Agent preparing the Affidavit may have meant to say that Doe had arranged for confidential buys in the past, Doc. 136 at 9, but the paragraph in the Affidavit says that controlled buys were made from Cervantes and Lopez. That statement is false.

controlled buys had occurred at the time the Affidavit was submitted to the Court.[165]

But it is not enough to show that a statement in the Affidavit is false. To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing" that the statement was intentionally or recklessly included in the Affidavit.[166] Lopez has not done so.

Lopez knows that a controlled buy had not occurred at the time the government sought a Title III order at least in part because the Affidavit says so—repeatedly.[167] It is simply not plausible to infer that the affiant intended to fool the Court into believing that a controlled purchase had occurred when the Affidavit makes clear—plainly, prominently, and at least three times—that one had not.[168] This is especially so because the statement Lopez complains about is buried in a description of Doe's reliability.[169]

Lopez has, at most, shown that the affiant made an inadvertent or negligent error while completing that paragraph of the Affidavit. That is not enough to warrant a *Franks* hearing or the suppression of the evidence collected as a result of the Title III order.[170]

Moreover, a *Franks* hearing is not warranted where a defendant fails to show that, but for the false or misleading statement, the Title III order would not have issued.[171] The single, isolated false statement here does not affect the probable cause analysis discussed above. Moreover, the Affidavit repeatedly states that no controlled buys were made, which corrects for any chance that the false statement in paragraph 13 could have misled the Court.

To the extent that Lopez means to suggest that—without the false statement—the Affidavit fails to establish Doe's reliability, the Court is not persuaded. While Agent Smith may not have

---

[165] *See* Affidavit at ¶ 82.
[166] *Poulsen*, 655 F.3d 492 (quoting *Mastromatteo*, 538 F.3d at 545).
[167] Affidavit at ¶¶ 63–68, 82, 112.
[168] *Id.*
[169] *Id.* at ¶ 13.
[170] *Asker*, 676 F. App'x. at 456 (quoting *Franks*, 438 U.S. at 171).
[171] *See Poulsen*, 655 F.3d at 504–05.

conducted a controlled buy to confirm Doe's reliability, he confirmed Doe's reliability in a number of other ways. For instance, many of Doe's conversations with Cervantes were recorded and reviewed; law enforcement surveilled at least one of Doe's meetings with Cervantes; and officers reviewed phone records to confirm that calls between Doe and Cervantes occurred.[172] Moreover, Doe has been working with law enforcement, including the FBI, since 2001 and none of his information has been found to be false or misleading.[173]

For those reasons, the Court concludes that a *Franks* hearing is unnecessary and that suppression is not warranted based on the false statement in the Affidavit.[174]

### 3. The Affidavit Adequately Alleged the Insufficiency of Alternative Methods

Finally, Lopez contends that the government failed to satisfy Title III's necessity requirement: the statute's mandate that the government show the issuing magistrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[175] The Court disagrees.

The Court notes that "wiretapping is particularly appropriate when"—as in many drug conspiracy cases—"the telephone is routinely relied on to conduct the criminal enterprise under investigation."[176] That is certainly the case here. The Affidavit reveals extensive use of multiple phones, phone calls, and text messages to plan and execute the alleged drug conspiracy.

It is also plain that a wiretap was not being employed "as the initial step" in the government's investigation.[177] Indeed, the agents involved with this case used a number of

---

[172] *See, e.g.*, Affidavit at ¶¶ 17, 21–23 & n.5.

[173] *Id.* at ¶ 13.

[174] The court also declines to hold an oral hearing on the remainder of Lopez's motion to suppress. The Court finds that the arguments presented in the briefs are sufficient to inform its decision and that neither oral argument nor an evidentiary hearing would aid it in its decision.

[175] Doc. 132 at 16–19; *Poulsen*, 655 F.3d at 503–04; 18 U.S.C. § 2518(3)(c).

[176] *See Stewart*, 306 F.3d at 305–06 (quoting *Landmesser*, 553 F.2d at 20).

[177] *Alfano*, 838 F.2d at 163 (quoting *Landmesser*, 553 F.2d at 20).

techniques before applying for Title III authorization in November 2016, including: a confidential informant, an undercover agent, physical surveillance, consensual recording of phone and in-person conversations, pen register or tap-and-trace devices, trash pulls, and investigation of financial records.[178]

And the Affidavit discusses why continued use of those methods would not provide law enforcement with the information it needed. The purpose of this investigation was not simply to apprehend and convict Cervantes and Lopez, but to reveal and dismantle Lopez's entire network by finding out who was involved and how it operated.[179]

For instance, the Affidavit explains that the use of a confidential source is not likely to give the necessary prosecution information because drug organizations, and particularly those affiliated with Mexican drug cartels, are secretive and operate in cell-like groups that are not aware of one another.[180] There were multiple indications that Mexican drug cartels might have played a role in this conspiracy.[181] If the source attempted to probe for information about the scope or inner workings of the organization, its leaders would likely become suspicious.[182] And suspicious behavior can be deadly where the cartels are concerned.[183] All of this is also true of the use of undercover agents.[184]

Physical surveillance also was not sufficient. Repeated surveillance can breed suspicion and, in this case, recorded conversations show Cervantes had already come to believe the FBI was watching him.[185] Cervantes had also engaged in counter-surveillance measures that caused agents

---

[178] *See, e.g.* Affidavit at ¶¶ 4 n.1, 15, 97–98, 100, 107, 127, 130, 139.
[179] *See id.* at ¶ 90.
[180] *Id.* at ¶ 102.
[181] *See id.* at ¶¶ 17 & n.3, 26, 45, 57.
[182] *Id.* at ¶ 102.
[183] *Id.* at ¶¶ 101, 104, 117.
[184] *Id.* at ¶¶ 110–11.
[185] *Id.* at ¶¶ 127

surveilling him to call off their pursuit on at least one occasion.[186]  The fear of arousing greater suspicion is a valid reason to believe that maintained or increased physical surveillance would not be sufficient to provide law enforcement with the information it needs.[187]

Likewise, financial records would not remedy these difficulties, because proof of assets alone is not enough for conviction. [188]  While large, unexplained cash infusions might be suspicious, they are not necessarily criminal.  That is especially so in cases like this one, where suspects like Cervantes have legitimate reasons why they might have a high cash flow (he owns several restaurants).  Nor do they necessarily shed light on the inner workings of a drug conspiracy except to reveal who is paying whom.

Pen registers, toll record data, tap-and-trace devices, and consensual recordings would be similarly ineffective.  Pen registers, toll record data, and tap-and-trace devices reveal only what numbers were dialed and call duration, they do not reveal the content of the communications (which would be essential in revealing the organization's structure).[189]  And consensual recordings can reveal only the conversations that the consenting party, like a confidential source or undercover agent, participates in.  So they are limited by the same factors that limit confidential sources and undercover agents.

Trash pulls were used had not revealed anything useful at the time the officers sought Tittle III authorization.[190]  But even if officers had recovered abandoned parcels, they would likely reveal very little about the organization's structure.[191]  Moreover, someone is bound to notice people digging through the publicly placed dumpsters of several Mexican restaurants.[192]

---

[186] *Id.* at ¶¶ 64, 127.
[187] *See Lambert*, 771 F.2d at 91.
[188] *Id.* at ¶ 97.
[189] *See id.* at ¶ 130–34.
[190] *Id.* at ¶ 139.
[191] *Id.*
[192] *Id.* at ¶ 140.

The Affidavit also addresses why other, albeit untried, methods of investigation would not work. For instance, mail covers provide only the information on the outside of an envelope or package, they do not reveal its contents.[193] Moreover, drug organizations frequently use fictitious addresses and names on the parcels.[194] And those dropping off such packages are usually low-level organization members with little knowledge of the organization as a whole.[195] Interviews or immunity deals would be ineffective because many drug organization participants fear reprisals for cooperation and news of the interviews might reach the organization and alert it of the investigation.[196] Fear of reprisals is also a strong reason to believe that grand jury investigations would not be sufficient.[197] Pole cameras do not reveal the content of communications.[198] Vehicle tracking devices don't reveal who is making the trip or why.[199] And search warrants will not do because they inevitably tip off suspects; drug organizations frequently don't maintain clear and detailed records of their activities; and it would be difficult to tie discovered drugs to those higher up in the organization without additional evidence, such as that obtained through wiretaps.[200]

It is true, as Defendant Lopez points out, that the officers had not yet successfully purchased narcotics from the organization at the time they requested Title III authorization.[201] But it is also true, as the Affidavit points out, that a controlled buy would not reveal much about the organization that the agents did not already know.[202] It might provide another name and give some idea how the organization delivers its drugs. But it would not necessarily shed much light on how the organization is structured, reveal all of its players, or lead law enforcement to the means by

---

[193] *Id.* at ¶ 94.
[194] *Id.*
[195] *Id.* at ¶ 95.
[196] *Id.* at ¶ 119–21.
[197] *Id.* at ¶ 124.
[198] *Id.* at ¶ 135.
[199] *Id.* at ¶ 137.
[200] *Id.* at ¶¶ 143–47.
[201] *Id.* at ¶ 112; Doc. 132 at 14–15.
[202] *See* Affidavit at ¶ 112.

which the drugs were entering the country.[203]  Moreover, conducting controlled drug purchases puts law enforcement and their informants in harm's way.[204]

All in all, it seems plain that law enforcement diligently pursued conventional investigation techniques before seeking Title III authorization; it was not their option of first resort.  Indeed, Lopez essentially admits as much when he says that agents sought wiretaps in this case "because they were worried about their investigation going cold."[205]  Agents typically do not fear that their case is going cold when promising avenues of investigation are still open to them.

And the Affidavit shows that the investigating officers gave "serious consideration" to other alternatives before seeking a wiretap.[206]  While it is true that some of the claims in the Affidavit could be considered "boilerplate" observations about drug crimes, that is not fatal to the application so long as the application of those generalized assertions is supported by sufficient Affidavit facts.[207]  They were in this case.

While other means possibly might have provided needed case information, the "necessity requirement does not require the government to exhaust every investigative tool" or "prove that every other conceivable method has been tried and failed" before seeking a Title III wiretap.[208]  The Affidavit in this case showed that other means were sufficiently ineffective or dangerous to warrant issuing a Title III order.

For those reasons, the Court **DENIES** Defendant Lopez's motion to suppress.

---

[203] *Id.* at ¶ 116, 118.
[204] *Id.* at ¶ 117.
[205] Doc. 132 at 19.
[206] *Stewart*, 306 F.3d at 305 (quoting *Lambert*, 771 F.2d at 91).
[207] *United States v. Rice*, 478 F.3d 704, 710–11 (6th Cir. 2007); *Landmesser*, 553 F.2d at 20–21.
[208] *Asker*, 676 F. App'x. at 458 (quoting *Alfano*, 838 F.2d at 163).

## III. MOTION TO DISMISS

### A. Legal Standard

The government bears the burden of proving by a preponderance of the evidence that the Northern District of Ohio is a proper venue for prosecuting Defendant Estrada.[209]  Unless a rule or statute permits otherwise, "the government must prosecute an offense in a district where the offense was committed."[210] But a crime with multiple acts done in multiple venues may be prosecuted anywhere where any part of that crime can be proven to have been committed.[211]

### B. Venue is Proper as to Defendant Estrada

The Government charged Defendant Estrada with (1) conspiracy with intent to distribute methamphetamine and cocaine and (2) use of a communication facility in a felony related to controlled substances.[212]  Defendant Estrada argues that venue was improper in this case because his acts occurred in Oregon.[213]  The Court disagrees.

The Court begins by noting that neither party has requested an evidentiary hearing on this motion.  For that reason, the Court decides whether venue is proper based on the allegations in the indictment and the government's representations as to what the evidence would show at trial.[214]  If the evidence at trial reveals that there is some question as to whether venue is proper, Defendant Estrada is free to request a jury instruction or judgment of acquittal on that basis.[215]

As to the conspiracy charge, the government alleges that Estrada was a distributor who

---

[209] *United States v. Kuehne*, 547 F.3d 667, 677 (6th Cir. 2008).
[210] Fed. R Crim. P. 18.
[211] *Kuehne*, 547 F.3d at 677.
[212] Doc. 1 at 1–88, 94.
[213] Doc. 126.
[214] *See United States v. Fry*, 413 F. Supp. 1269, 1271–72 (E.D. Mich. 1976) ("For purposes of this motion, the allegations of the indictment must be accepted as true.  Ultimately, venue is a matter for proof at trial." (internal citations omitted)); *see also United States v. Wells*, 631 F. App'x. 408, 410–11 (6th Cir. 2015) (affirming denial of a motion to dismiss for lack of venue where, because neither side requested a hearing, the district court ruled without an evidentiary hearing based on the government's representation as to what would be shown at trial).
[215] *See United States v. Jeffries*, No. 3:10-CR-100, 2011 WL 13186518, at *6–7 (E.D. Tenn. May 24, 2011).

purchased drugs from Lopez as part of Lopez's conspiracy to sell drugs from, among other places, the Northern District of Ohio.[216]  A conspiracy charge may be brought anywhere that an overt act in furtherance of the conspiracy occurred, regardless of whether the defendant was present there.[217] The indictment alleges multiple overt acts in furtherance of this conspiracy occurred in this district.[218]  Estrada can, therefore, be prosecuted for conspiracy here.[219]

To convict someone of use of a communications facility in furtherance of a felony under 21 U.S.C. § 843(b), the government must show that a felony actually occurred.[220]  Thus, committing a felony is a predicate act necessary for conviction under § 843(b).[221]  It follows that a defendant can be prosecuted for violating that statute both where the communication facility was used and where the predicate felony occurred.[222]  Here, the government alleges that Estrada's predicate offense was conspiracy to possess with intent to distribute methamphetamine and cocaine.[223]  And, as the Court has already said, a portion of that conspiracy occurred in this district, making it a proper venue for the use of a communications facility charge.[224]

For those reasons, venue is proper in this district and the Court **DENIES** Defendant Estrada's motion to dismiss.

---

[216] Doc. 137 at 1–2.
[217] *Wells*, 631 F. App'x. at 414.
[218] *E.g.*, Doc. 1 at 23, 150–52.
[219] *Wells*, 631 F. App'x. at 414.
[220] *See* 21 U.S.C. § 843(b).
[221] *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1121 (10th Cir. 2011).
[222] *Id.* at 1122; *cf. United States v. Rodriguez-Moreno*, 526 U.S. 275, 280–82 (1999).
[223] *See* Doc. 1 at 1–88, 94.
[224] *Acosta-Gallardo*, 656 F.3d at 1122.

# CONCLUSIONS

For all those reasons, the Court **DENIES** Defendant Lopez's motion to suppress and

Defendant Estrada's motions to join Lopez's suppression motion and to dismiss.


IT IS SO ORDERED.


Dated:  March 13, 2018                          *s/        James S. Gwin*
                                                JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE